**T.O. BELL, Plaintiff-Appellant,**

v.

**DOW CHEMICAL COMPANY, Defendant-Appellee.**

No. 87–2306.

United States Court of Appeals, Fifth Circuit.

June 29, 1988.

Nancy McCoy, Fritz Barnett, Glickman & Barnett, Houston, Tex., for Bell.

David M. Bond, Houston, Tex., for Dow Chemical Co.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GEE, Circuit Judge:

T.O. Bell seeks relief under Section 2 of the Sherman Act. His action below included claims under both Sections 1 and 2 for anticompetitive activities of Dow Chemical Company ("Dow") and others in the phenoxy herbicide market. The district court granted summary judgment on both claims to the defendants; Bell appeals only his monopoly claim against Dow; and we affirm the judgment of the district court.

*Facts*

Phenoxy herbicides are used to control or eliminate weeds and brush. The United States Government was the largest consumer of 2,4–D and 2,4,5–T phenoxies (the main types) in the latter half of the 1960s, as it combined these chemicals into the well-known herbicide "Agent Orange." After the government ceased ordering the chemicals in 1969, the number of manufacturers contracted, leaving only four by 1972. Dow was and continues to be the largest manufacturer of phenoxy herbicides in the United States.

Phenoxy herbicides are manufactured in three forms. The initial form, an acid powder, cannot be directly applied for weed and brush control. It is uncontested that Dow was the only manufacturer of the acid form in the United States when Bell filed this suit. The acid powder is converted into "technical material" through a manufacturing process. Technical material has been infrequently applied to brush and weeds.[1] Through further processing, technical materials are made into water-or petroleum-soluble "formulated" herbicides. Consumers buy the formulated variety from different manufacturers and dealers and apply them through various methods.

In the past, Dow has sold its herbicidic acid to several manufacturers of formulated herbicides.[2] In turn, Dow and the principal purchasers of its acid, Rhodia and Transvaal, sold both acids and technical materials to many other companies that produced the formulated phenoxy herbicides containing 2,4–D and 2,4,5–T. In addition, Dow has sold its brand of formulated herbicides to hundreds of independent distributors who have sold them at retail to the public. Into this net of manufacturers

---

**1.** In the 1960s, Dow advertised the commercial advantages of directly spraying technical material from "cropdusting" aircraft. It discontinued this marketing approach about the time Bell attempted to introduce his machine applicator to the market.

**2.** The Rhodia and Transvaal companies were the only purchasers of acid material from Dow in the early 1970s when the actions that have given rise to this suit transpired. Rhodia and Transvaal were defendants in Bell's Section 1 claim below, but they are not parties in this appeal of the Section 2 claim.

and distributors Bell stepped in 1972, seeking a supplier of technical material.

Bell had invented a phenoxy herbicide applicator. The applicator uses an "ultra low volume" method of applying herbicide to pastures and rangelands. This low volume translates to cost savings for the farmer because less herbicide is needed to control an area with Bell's applicator than is needed with other applicators. Bell contends that the technical herbicide form is most suitable for his machine. By requiring fewer pounds of active ingredient to control weeds and brush, and by using the more cost efficient technical form of phenoxy herbicide,[3] Bell anticipated reaping huge profits from the sale of his applicator to end users of phenoxy herbicides. From his perspective, the only barrier to his success was the alleged refusal of Dow and others in the early 1970s to sell him the technical material and to label the technical materials with his method of application. His pursuit of redress comes to us as a claim of illegal monopolistic behavior by Dow in the phenoxy herbicide market.

*Discussion*

Bell alleges that Dow monopolized or attempted to monopolize the phenoxy herbicide market in violation of Section 2 of the Sherman Act. Bell must prove three elements in order to obtain recovery: 1) Bell has antitrust standing to challenge Dow; 2) Dow either possesses or intends to possess monopoly power in a relevant market; and 3) Dow has acquired or maintained its power or intends (with a dangerous probability of success) to do the same in a manner that exhibits willfullness, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Aspen Skiing Company v. Aspen Highlands Skiing Corporation,* 472 U.S. 585, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985); *United States v.*

*Grinnell,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Transource International v. Trinity Industries, Inc.,* 725 F.2d 274 (5th Cir.1984).

The district court found that Bell failed to satisfy *any* of the elements. Although we reject the district court's disposition of the third element concerning Dow's monopolizing conduct, we affirm the grant of summary judgment.

### 1. *Antitrust Standing*

Recent Supreme Court and Fifth Circuit decisions concerning whether a party has antitrust standing have left some confusion as to the role that "antitrust injury" plays in the standing inquiry. We initially address a formal misapprehension of the district court.

The district court addressed antitrust injury as a "separate inquiry" from the standing determination. After concluding that, as a potential customer and competitor of Dow in herbicide sales, Bell had standing to sue, the district court ruled that Bell had failed to offer any proof that he had been injured by anticompetitive activities of Dow. The formal progression of the district court's analysis is improper. Antitrust injury is a component of the standing inquiry, not a separate qualification. In *Walker v. U–Haul Co. of Mississippi,* 734 F.2d 1068, 1073 (1984), we held that "standing defines the plaintiff's right to sue and the existence of injury is a component of the substantive right." Proving antitrust injury is a necessary requirement for proving standing; the former cannot stand alone from the latter. As such, the district court should not have determined first that Bell had standing to sue, but that he lost the right because he did not offer adequate proof of antitrust injury.[4]

---

3. Bell argues that the formulated phenoxies are more expensive than the technical phenoxies because of the additional expense of manufacturing the formulated phenoxies from the technical phenoxies.

4. Borrowing from the beginning of a footnote in *Walker,* Bell argues that antitrust injury—the proof of an anticompetitive effect upon the

plaintiff—is not required in Section 2 cases. 734 F.2d at 1073 n. 19. Unfortunately, Bell failed to read the end of the footnote. Whereas Section 2 does not *explicitly* require that a plaintiff prove anticompetitive effect, we have held that the concept of antitrust standing applies to violations of Section 2. *See Bayou Bottling, Inc.*

The district court first found that Bell does not have standing as a manufacturer and seller of the herbicide applicator. Bell argues that Dow's monopolization of the phenoxy herbicide market injured his equipment sales. As the district court noted, "there is no evidence that Dow's conduct caused the loss of future sales, as opposed to any number of factors—e.g. price, market conditions, unproven technology, limited product uses, or Bell's inability to purchase technical material from other distributors." After considering the factors outlined in *Associated General Contractors v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the court found that Bell's attested harm was speculative and the directness of his injury was remote: "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to antitrust violation.'" 459 U.S. at 535, 103 S.Ct. at 907, *quoting Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972).

We agree with the district court's disposition of this issue. *Associated General Contractors* articulated the high standing threshold that plaintiffs must cross in the antitrust setting. Unlike the case of the more modest constitutional standing requirement of injury in fact, courts addressing antitrust claims "must make a ... determination whether the plaintiff is a proper party to bring a private antitrust action." 459 U.S. at 535 n. 31, 103 S.Ct. at 907 n. 31. In making the determination, courts may assess several factors: 1) the nature of plaintiff's alleged injury; 2) the directness of the injury; 3) the speculative measure of the harm; 4) the risk of duplicative recovery; and 5) the complexity in apportioning damages.

Regarding the first factor, plaintiff's injury must be the type that the antitrust laws were intended to prevent. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The court's focus must be upon competition in the allegedly restrained market. Restraint in the market affects consumers and competitors in the market; as such, they are the parties that have standing to sue. 459 U.S. at 539, 103 S.Ct. at 909; *Eagle v. Star-Kist Foods, Inc.,* 812 F.2d 538, 540 (9th Cir.1987).

As an inventor, manufacturer, and seller of an herbicide applicator, Bell was neither a consumer nor a competitor in the phenoxy herbicide market. To surmount this standing barrier, Bell alleges—and the district court found—that he was a "potential consumer and competitor" in the market. In his deposition and affidavit, Bell testified that he attempted to purchase technical phenoxies from Dow on several occasions. After his first attempt, he purchased phenoxies from another supplier. When he ceased purchasing from that supplier because of the price charged, he contends that he returned to Dow and was refused sales again. Dow argues that Bell failed to meet minimum purchase requirements, and Bell insists that Dow did not have any such requirements and simply intended to restrain trade in the market. On loose footing, Bell frocks himself as both a consumer and competitor in the phenoxy herbicide market.

As we noted above, the district court found that Bell failed to demonstrate antitrust injury. We find a lack of standing on other, more apparent grounds. Bell seeks damages from Dow for alleged lost profits from the sale of his herbicide applicator. The district court correctly noted that these losses were very speculative. Bell made no claim of damages for lost profits from the sale of technical phenoxy that he intended to sell with his machine. Bell's machine should have sold well during the 1972–74 period when Bell purchased materials from Transvaal. Bell blames the lack of sales on the high price Transvaal charged for the materials; other causal possibilities abound, such as the price of the machine or its limited product uses. Courts must be cautious in granting antitrust standing to parties that offer "speculative, abstract, or impractical damages

*v. Dr. Pepper Co.,* 725 F.2d 300, 303 (5th Cir. 1984).

theories." *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 475, n. 11, 102 S.Ct. 2540, 2546 n. 11, 73 L.Ed.2d 149 (1982), *citing Hawaii v. Standard Oil Co.,* 405 U.S. at 262–63, n. 14, 92 S.Ct. at 891 n. 14. Because of Bell's speculative damage claim, we approve of the result reached by the district court on this issue.

### 2. *The Relevant Market*

The district court also found fault with Bell's characterization of the relevant market. Bell wanted to buy technical herbicides from Dow and others to sell to purchasers of his applicator. Bell repeatedly asserts that his machine operates better by using the technical materials than the formulated herbicides, and the driving premise of his complaint is that Dow's refusal to sell him technical materials had an anticompetitive effect upon the phenoxy herbicide market. He never suggests that his machine could use simply the acid form. One would expect that Bell would try to define the market as limited to that for technical phenoxies. Certainly, the market for the acid form should not be included in Bell's market definition; it is in no way interchangeable with the technical or formulated phenoxies for purposes of commercial use. The relevant market for gasoline sales may include ethanol and diesel, but *not* black crude. The district court aptly characterized this imprecision in Bell's definition of the relevant market:

> There is no evidence in the record that differentiates the phenoxy herbicide market, that Bell alleges, from the market for acid form, technical material, and formulated herbicides. Plaintiff's acid production data or acid market share data is no evidence of monopoly in either the technical or formulated herbicide product markets. Acid material is a chemical precursor to an end-use herbicide. The two are chemically and functionally distinct. There is no interchangability of use between the two. Therefore, one cannot extrapolate market share data for acid as evidence of market share in formulated herbicide.

Bell argues that the district court injected its opinion as to the credibility of Bell's expert witness on this issue of the relevant market. Noting that the issue is ordinarily one of fact for the jury, *Domed Statium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 487 (5th Cir.1984), Bell contends that the district court improperly made the factual determination itself.

 The district court, however, did not act as arbiter of credibility; it simply found that the relevant market could *not* include the acid form. Summary judgment is appropriate where expert testimony rests on an erroneous assumption of law or fact. Here, Bell's expert erroneously assumed that market power in the production of acid form necessarily implies similar power in the market for products *derived* from the acid form. Without evidence demonstrating that consumers can use the acid form directly to control brush and weed, the acid form market cannot be considered part of the relevant market. By failing to provide any evidence of the market share Dow possesses in the technical and formulated phenoxies, Bell has failed to raise an issue of material fact on market power. We agree with the decision of the district court on this issue.

### 3. *Exercise of Monopoly Power*

Bell also challenges the district court's determination that no evidence was submitted showing that Dow's actions were motivated by a monopolizing purpose. In making this determination, the district court relied upon the general rule that a monopolist does not have a duty to deal.

> In the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent discretion as to parties with whom he will deal.

*United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

 The first clause of the *Colgate* proposition qualifies the general rule: *In the absence of any purpose to create or*

*maintain a monopoly.* In other words, the *Colgate* dicta allows refusals to deal to be used as evidence of a purpose to create or to maintain a monopoly. In a later commentary on the passage, the Supreme Court noted that the right to refuse to deal is not unqualified. *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). The exercise of the right to refuse to deal "as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act." 342 U.S. at 155, 72 S.Ct. at 187. On several occasions our Circuit has found a refusal to deal to be evidence of an intent to preserve a monopoly or to distort competition. *See Poster Exchange, Inc. v. Nat'l Screen Service Corp.,* 431 F.2d 334 (5th Cir.1970); *Six Twenty-Nine Prods, Inc. v. Rollins Telecasting, Inc.,* 365 F.2d 478 (5th Cir.1966).

■ Defendants can offer business justifications for the refusal to deal. If the justifications are supported by legitimate business concerns (such as cost savings, shortage of supplies, more efficient production), then the district court may decide as a matter of law that the defendant's refusal " 'was actuated by innocent motives rather than by an intention and desire to perpetuate a monopoly.' " *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 375, 273 S.Ct. 684, 690, 71 L.Ed. 684, 690 (1927). In *Poster Exchange,* we found that a monopolist illegally intended to drive a competitor out of a market by, in part, refusing to deal with the competitor. Because we found no legitimate business justification for defendant's actions, the district court's finding of intent was not found to be clearly erroneous. 431 F.2d at 340.

Bell contends that even if Dow offers legitimate business justifications for refusing to deal, the sufficiency of these justifications "is a question of fact which pre-cludes summary judgment." As support for this argument, Bell urges us to focus our attention on *Aspen Skiing Co. v. Aspen Highlands Skiing,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). We do not find, however, that *Aspen* holds what Bell contends.

In *Aspen,* the operator of one ski mountain, Highlands, brought an antitrust action against another resort company, Ski Co., that operated the other three mountains clustered near the town of Aspen, Colorado. Because the issue of monopoly power was not properly preserved for appeal, the Supreme Court accepted the lower court's finding that Ski Co. possessed monopoly power.[5] The Supreme Court addressed whether Ski Co.'s refusal to continue a joint ski-ticket marketing arrangement with Highlands constituted evidence of monopolistic intent.[6]

The trial judge charged the jury that a refusal to deal with a competitor "does not violate Section 2 if valid business reasons exist for that refusal." Ski Co. proffered several business reasons why it abandoned the joint marketing arrangement, but the jury apparently found them to be unreasonable. Looking back to *Lorain Journal,* 342 U.S. 143, 72 S.Ct. 181, the Supreme Court noted that there is no unqualified right to refuse to deal with others.

> Ski Co., therefore, is surely correct in submitting that even a firm with monopoly power has no general duty to engage in a joint marketing program with a competitor. Ski Co. is quite wrong, however, in suggesting that the judgment in this case rests on any such proposition of law. For the trial court unambiguously instructed the jury that a firm possessing monopoly power has no duty to cooperate with its business rivals....
>
> The absence of an unqualified duty to cooperate does not mean that every time

---

**5.** Aspen is a destination resort town, and thus the relevant market determination should have included other destination resorts in Colorado and surrounding states.

**6.** Ski and Highlands had marketed an Aspen multi-area ticket whereby destination skiers could purchase a six-day lift ticket at a discount below the daily rate. The ticket allowed the visitor to ski on any of the four mountains, and Ski and Highlands divided revenues according to estimates of usage on each of the respective mountains. Ski discontinued the marketing arrangement with Highlands when the two companies could not agree upon a mutually acceptable fee sharing.

a firm declines to participate in a particular cooperative venture, that decision may not have evidentiary significance, or that it may not give rise to liability in certain circumstances. The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.

472 U.S. at 600–01, 105 S.Ct. at 2856–57. Reviewing the record in the light most favorable to Highlands, the Supreme Court found that "the evidence supports an inference that Ski Co. was not motivated by efficiency concerns," i.e. legitimate business reasons. 472 U.S. at 610, 105 S.Ct. at 2861–62.

*Aspen* does not hold that a jury can weigh the sufficiency of a legitimate business justification against the anticompetitive effects of a refusal to deal in order to find intent by a defendant to monopolize. To the contrary, the district court in *Aspen* specifically instructed the jury that "a company which possesses monopoly power and which refuses to enter a joint operating agreement with a competitor or otherwise refuses to deal with a competitor in some manner does not violate § 2 if valid business reasons exist for that refusal." 472 U.S. at 597, 105 S.Ct. at 2854. The fact determination that may be left to a jury is whether the defendant has a legitimate business reason for its refusal, *not* whether that reason is sufficient. The *Aspen* jury presumably found all of Ski Co.'s business justifications to be unpersuasive, *not* persuasive but insufficient. The preclusive effect of finding a legitimate business justification was acknowledged by our Court recently. *See Mid-Texas Communications v. American Tel. & Tel. Co.*, 615 F.2d 1372, 1390 (5th Cir.1980) (where a defendant's "purpose in refusing interconnection was to vindicate the public interest [as set forth in regulatory policy], then the refusal, despite its obvious anticompetitive effect, would have been proper and entitled to protection from antitrust scrutiny").

Despite our refusal to adopt Bell's interpretation of *Aspen,* we find that the district court erred when it held that Bell "failed to offer any evidence that Dow's actions were motivated by a monopolizing purpose." Bell offered significant evidence undercutting the credibility of the justifications offered by Dow. In a letter explaining its refusal to sell to Bell when he first inquired in 1972, Dow explained that "the industry finds themselves in an [sic] temporary over-sold position, and consequently, Dow has allocated all products in the phenoxy group." In his deposition, however, the gentleman who wrote the letter stated that the real reason was that Bell failed to meet Dow's minimum purchase requirements. Another Dow representative contradicted himself in deposition and affidavit testimony when he asserted in the former that he knew of no minimum purchase requirements of Dow but said in the letter that Dow did not sell to Bell because he "failed to meet Dow's minimum purchase requirements." The credibility determination here is one that should be left to a jury. The inconsistencies raise an issue of fact as to whether Dow had a justified purpose in refusing to sell to Bell.

### 4. *Statute of Limitations*

Dow contends that Bell's monopolization claim is barred by the four-year statute of limitations. 15 U.S.C. § 156. Dow cites *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936 (9th Cir.), cert. denied, 454 U.S. 816, 102 S.Ct. 92, 70 L.Ed.2d 84 (1981) for the proposition that limitations on refusals to deal begin to run from the date of the first alleged refusal: because Bell alleges that Dow first refused to deal in 1972, his lawsuit filed in 1978 is barred by limitations.

The general rule in our Circuit is that an antitrust cause of action accrues each time a defendant commits an act that injures plaintiff. As long as a suit is filed within four years of the time of accrual, the action is not barred by limitations. *Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029, 1035 (1977).

This general rule applies to all types of anticompetitive behavior, including refusals to deal.

This much is clear from our own leading case on the subject, *Poster Exchange, Inc. v. National Screen Service Corp.,* 517 F.2d 117 (5th Cir.1975), where we dealt with an alleged conspiracy among the defendants to refuse to sell certain articles to plaintiff. In that case it was undisputed that defendants had stopped supplying plaintiff with these articles in 1961. Plaintiff filed its anti-trust suit in 1969, and defendants argued successfully to the district court that recovery should be barred because more than four years had elapsed between the cutoff of supplies to plaintiff and the commencement of the suit.

Relying heavily on *Zenith [Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971)], we reversed and remanded summary judgment for defendants. We held that plaintiff would be entitled to maintain the suit if, on remand, it could show that "there had been a specific act or word of refusal [by defendants] during the limitations period." 517 F.2d at 129. This was so because such a reiteration of defendants' refusal to deal would have constituted an "act" within the meaning of *Zenith* and because "each injurious act of a continuing conspiracy gives rise to an antitrust cause of action." *Id.* at 127; see also *Braun v. Berenson,* 432 F.2d 538 (5th Cir.1970).

*Id.* at 1034–35.

■ Our Circuit has set forth a different rule than that of the Ninth Circuit. We must follow the lead of *Poster Exchange,* not that of *David Orgell, Inc.* Although filed more than four years after the first alleged refusal to deal, Bell's suit is not barred by limitations if a triable issue of fact remains as to Dow's alleged refusal to deal in 1974. The district court did not make this determination in its opinion. Because we affirm the judgment in favor of Dow on other grounds, the issue of whether Bell has raised a triable issue of fact need not be remanded.

*Conclusion*

Bell initially filed suit in 1978 against Dow and two other companies for antitrust violations. After eight years of discovery, the district court granted defendants' motion for summary judgment. Bell's principal claim was that Dow and the other companies had conspired to refuse to sell technical material to Bell or to list Bell's method of herbicide application on their product labels, in violation of Section 1 of the Sherman Act. Bell also contended that Dow violated Section 2 by monopolizing or attempting to monopolize the phenoxy herbicide market. Bell appealed only the Section 2 claim.

The district court carefully considered Bell's Section 2 claim and found that Bell lacked standing, had failed to offer a genuine issue of fact on the relevant market, and had offered no evidence that Dow's actions were motivated by a monopolizing purpose. Because we find that Bell did raise a triable issue of fact on the purpose issue, we reject the district court's disposition on that issue alone. The others must stand, and we AFFIRM the judgment of the district court.