**BAYOU FLEET, INC.**

v.

**Ellis A. ALEXANDER, Individually and in His Official Capacity as a Member of the St. Charles Parish Council, et al.**

No. Civ.A. 97–2205.

United States District Court,
E.D. Louisiana.

Sept. 29, 1999.

J. Mac Morgan, New Orleans, LA, for Plaintiff.

Joel T. Chaisson, Chaisson & Chaisson, Destrehan, LA, Jack M. Capella, David J. Motter, Capella Law Firm, Metairie, LA, for Defendants.

### MEMORANDUM OPINION

MENTZ, District Judge.

Plaintiff Bayou Fleet, Inc. filed this action for monetary, injunctive, and declaratory relief alleging civil rights violations under 42 U.S.C. § 1983, antitrust violations under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state law violations of the Louisiana Unfair Trade Practices Act, La. Rev.Stat. ann. § 15:1401, et seq. Bayou

Fleet named as defendants, Ellis Alexander, individually and as a member of the St. Charles Parish Council, St. Charles Parish, Coregis Insurance Company, Neal Clulee ("Clulee") and his wife Mary Clulee (referred to herein jointly as "the Clulees"), and two companies owned by the Clulees, Homeplace Batture Leasing, Inc. ("Homeplace") and N/C Materials, Inc.[1]

Bayou Fleet claims that Alexander and the Clulee defendants acted jointly and in conspiracy to put Bayou Fleet out of business through a series of arbitrary and capricious zoning challenges, permit challenges, and a sales tax audit which render them liable under section 1983 for violation of its rights to due process and equal protection of the law under the Fourteenth Amendment, and under the Sherman Act for conspiring and attempting to restrain trade and monopolize the river sand business. Bayou also claims that after it filed the present lawsuit, Alexander and the Clulee defendants continued to act jointly and in conspiracy to put Bayou Fleet out of business by adopting a criminal ordinance referred to herein as the "Levee Law," and the adoption of a resolution to appoint a "Special Legal Counsel" to determine whether Bayou Fleet had lost the non-conforming status of its property in violation of the same constitutional and statutory provisions above, as well as its First Amendment right of access to the courts. Bayou Fleet claims damages for loss of income due to delays in the permitting process allegedly caused by the conspirators, treble damages, attorney fees, and punitive damages.

After a trial on the merits of Bayou Fleet's request for a preliminary and permanent injunction, this court declared the Levee Law ordinance and the resolution to appoint Special Legal Counsel unconstitutional. *See Bayou Fleet, Inc. v. Alexander*, 1997 WL 625492 (E.D.La. Oct.7, 1997). The Parish Council subsequently voted to rescind the ordinance and resolution.

Shortly before trial of the defendants' liability, Bayou Fleet settled its dispute with Alexander, St. Charles Parish, and Coregis Insurance Company. The remaining issues before the court are the liability of the Clulee defendants for the alleged violations of antitrust, civil rights, and state unfair trade practice laws and damages, if any.

### FACTS

Plaintiff Bayou Fleet owns and operates sand pits located on the batture along the right descending bank of the Mississippi River in Hahnville, Louisiana, in St. Charles Parish. Bayou Fleet is a family-owned company represented at trial by one of the family members, Robin Durant.

Defendants Homeplace and N/C Materials are also family-owned companies in the sand pit business. Neal and Mary Clulee are the owners of Homeplace and N/C Materials. Homeplace owns a sand pit on the batture just down river from Bayou Fleet. Homeplace leases in part to N/C Materials, which handles the sales and trucking of the sand.

In 1981, Bayou Fleet's sand pit and the sand pit now owned by Homeplace were zoned B–1, which did not permit the operation of sand pits. Because both sand pits were in operation prior to the creation of that zoning classification, the sand pits were grandfathered to allow continued operations as a non-conforming use, provided that the sand pit activities were not suspended for a period of six months.

Bayou Fleet and the Clulee defendants are competitors in the sand business. They are the only active sand pit businesses in the greater Hahnville area. In between Bayou Fleet's and Homeplace's sand pits is a non-operating sand pit owned by the Giambelluca family. The sand pits are adjacent to residential areas of Hahnville. Two other sand pit busi-

---

1. Neal Clulee, Mary Clulee, Homeplace Batture Leasing, Inc. and N/C Materials, Inc. are referred to herein, *in globo,* as the "Clulee defendants."

nesses operate in the same market, but in the nearby town of Waggaman, Louisiana.

The Durants and the Clulees have a history of litigation over the years, as described below. The present controversy began in 1997 when Ronald Adams Contractors, Inc. ("RAC") obtained a Louisiana road construction contract which required a source of approximately 750,000 cubic yards of river sand for the job. The following is a chronology of the facts of what occurred when RAC undertook to acquire the sand.

RAC wanted to source its own sand by dredging the Mississippi River and stockpiling it in a sand pit. RAC sought quotes from Clulee and Durant to use their sand pits to stockpile the sand and haul out as needed for the project. RAC ultimately decided to use the Durant/Bayou Fleet sand pits.

In order to dredge sand from the Mississippi River, RAC had to obtain a permit from the U.S. Army Department Corps of Engineers. A permit is also needed from the Lafourche Basin Levee District Board of Commissioners (hereinafter "Levee Board") to operate a sand pit, meaning pumping, stockpiling, and hauling sand across the levee. A permit to operate Bayou Fleet's sand pit was held by a company called Vulcan, which offered to name RAC as licensee. RAC declined because it wanted all permits in its own name. If the Levee Board denies a permit to operate, the Corps of Engineers is required by regulation to deny a permit to dredge.

RAC started the permitting process in March, 1997. By resolution adopted April 3, 1997, the Levee Board issued a permit to RAC to make improvements to the levee crossing to Bayou Fleet's sand pits. On April 4, 1997, RAC submitted an application to the Corps of Engineers for a permit to dredge the Mississippi River. About this same time, it became apparent that there were neighborhood concerns about the project. The Corps of Engineers' file shows a flurry of complaints during this period from residents opposing the RAC permit. The evidence established that sand pit operations ·in general can cause public health problems from air pollution and safety risks, as well as nuisances to neighbors.

Andrew Courreges, RAC's operations manager, and Durant met with Alexander at Durant's office to assure him that they would make a good effort to abate potential problems for the community. Durant told Alexander that his pit was in operation and permitted. Alexander indicated that he would support the project.

Telephone records show a one-minute phone call from Clulee's home to Alexander's home on April 28, 1997.[2] Clulee recalls speaking with Alexander during this period about the status of Bayou Fleet's non-conforming use and the RAC permits. On approximately the same date, Alexander telephoned the Director of the Department of Planning & Zoning ("P & Z"), Earl Matherne, to advise him of his constituents' objection to the operation of Bayou Fleet's sand pits. He also advised Matherne that the residents were willing to testify that Bayou Fleet's sand pits had lost their non-conforming use because they had been shut-down for more than six months.

In response, Matherne advised RAC that it might have zoning problems with using Bayou Fleet's sand pits. On May 5, 1997, Matherne requested a legal opinion from Randy Lewis, Parish Attorney, regarding whether Bayou Fleet had lost it's non-conforming use by abandonment. Lewis investigated the issue, including reviewing documents voluntarily produced by Bayou Fleet, such as sales records and affidavits from truck haulers. If Bayou Fleet had lost its non-conforming use, RAC would either have to use a different sand pit, or Bayou Fleet would have to try to get Bayou Fleet's property re-zoned.

**2.** The court finds that none of the one-minute phone calls in this case involved any conversation, but show only that a call was made where an answering machine picked up.

On May 17, 1997, Courreges set up a meeting between himself, another RAC employee, and Clulee, to discuss purchasing sand from Homeplace's pit. They discussed the particulars of Clulee's bid. Courreges mentioned that he had received a letter in which Clulee questioned the project. Clulee explained that his only problem with the project was RAC's proposed dredging in front of his property. Courreges felt that Clulee seemed to have a lot of knowledge about the progress of RAC's permit applications. Clulee told Courreges that if RAC used his sand "he could keep local authorities 'satisfied' (sheriff's dept., weigh units, etc.) and left the 'rest' unsaid if [RAC did] not use him." [3] RAC decided to stick with Bayou Fleet.

On May 21, 1997, the Parish Attorney issued his opinion letter that Bayou Fleet had not lost its non-conforming use. Alexander disagreed with that opinion.

The St. Charles Parish Coastal Zone Advisory Committee (hereinafter "CZAC"), an eight-member committee that makes recommendations to the Parish Council on wetlands and environmentally-related permit applications within the Parish, had on its May 29, 1997 agenda, *inter alia*, the RAC permit application before the Corps of Engineers. The CZAC was to decide whether to recommend to the Parish Council that it submit a letter of objection or no objection to the Corps. Alexander prepared and mailed to everyone in the immediate area of the Bayou Fleet sand pits a notice of that meeting. The CZAC published an official notice as well.

Bayou Fleet received a copy of Alexander's notice. Durant was surprised by it because his prior meeting with Alexander led him to believe that Alexander would support the RAC project.

Alexander asked Clulee to attend the CZAC hearing, but he could not attend, so Clulee had his attorney Joel T. Chaisson (a retired state district court judge), attend on behalf of Homeplace. Alexander, Chaisson, and seven members of the public spoke in opposition to the project, their main concerns being dust, noise, increased industrial traffic on a substandard roadway, and the sand pits' alleged loss of its non-conforming use. The citizens also presented a petition with forty signatures against "the reopening of sand pits in Hahnville." There is nothing unusual about members of the public or Parish Council members presenting their views at a CZAC meeting. CZAC meetings are televised. Durant did not attend the hearing.

Phone records establish that on the day of the CZAC hearing, there were two phone calls from Clulee's home to Alexander's home—one for eight minutes and another for 12 minutes.

On May 30, 1997, the CZAC issued a recommendation to the Parish Council that a letter of no objection be issued to all concerned agencies.

On the same date, Mary Clulee wrote a letter on behalf of Homeplace to the Corps of Engineers objecting to RAC's permit application "on the basis that their proposed dredging area extended the entire length of our property." She further stated: "I feel that there is enough dredging area in the immediate area frontage fill of their site."

At the regularly scheduled June 2, 1997 meeting of the Parish Council, Alexander introduced a resolution calling for the Parish to issue a letter of objection to the Corps of Engineers based on concerns of air pollution and its effects on persons with medical problems such as asthma and emphysema, industrial congestion, noise, and dangers to children playing in the un-

---

**3.** The quoted language is from a summary of the conversation made by Courreges on an RAC "Standard Conversation Form."

fenced sand pits.[4] Alternatively, the resolution requested the Corps. to stipulate conditions for issuance of the permit that would ease neighborhood concerns.[5] One of the alternative conditions was for the trucks to drive behind the levee and exit at Homeplace's ramp to avoid driving along the river road near the residential areas. Because no such road existed, Durant believed that this condition was a subterfuge to block the deal with RAC. This resolution in effect would reject the recommendation of the CZAC that the Parish issue a letter of no objection. The Parish Council voted with one dissent to adopt Alexander's resolution of objection. Durant attended this meeting; the Clulees did not.

After the May 29 CZAC meeting and prior to the June 2 Parish Council meeting, there were four phone calls from the Clulee's home to Alexander's home—two for one minute each, one for nine minutes, and one for seven minutes—for a total talk time of 16 minutes.

By letters dated June 4, 1997, Alexander forwarded the Parish Council's objection to Senators Mary Landrieu and John Breaux asking for their support of the citizens' opposition to the RAC permit application before the Corps of Engineers. Both Senators responded by asking the Corps of Engineers to provide them with information about the project.

By letters dated June 5 and 6, 1997, Alexander requested P & Z and Chris Tregre, the Parish President, to advise him of the status of Bayou Fleet's non-conforming use.

By letters dated June 5 and 6, 1997, Alexander informed the Levee Board of the Parish Council's resolution to object. Alexander requested the Levee Board to rescind its prior permit for RAC to make improvements to Bayou Fleet's levee crossing and to deny RAC's pending operations permit application based on the harmful impact of the proposed operations on the residential community.

After considering the opposition Alexander presented, the Levee Board voted on June 5, 1997, to deny RAC an operations permit—(a permit to pump, stockpile, load, and haul sand over the levee).[6] Alexander promptly informed the Corps of Engineers of the Levee Board's decision. Because the Levee Board's denial meant automatic denial of a dredging permit from the Corps of Engineers, RAC requested the Corps to postpone decision on his application until he had a chance to defend his permit application before the Levee Board.

In the meantime, Durant had a friend, who was a fraternity brother of U.S. Congressman Robert Livingston, write to the Congressman to help expedite the Corps of Engineers' permit process. Livingston did write a letter to the Corps on June 24, 1997, but later in September, 1997 (after the Corps had granted the permit) withdrew his letter as he realized that the matter was not within his district, but the district of Congressman William J. Tauzin.

RAC wrote to Homeplace/Mary Clulee on June 27, 1997, assuring her that it did not intend to dredge in front of Homeplace's property.

On July 1, 1997, RAC and Durant attended a second meeting of the Levee Board and obtained a reversal of its decision to deny the operation permit. Alexander was also present. After the meeting, Alexander and Durant had a heated exchange. Durant informed Alexander

---

**4.** A child had been killed at Bayou Fleet's property while tunneling into sand piles.

**5.** Such as: limiting operations to daylight hours, requiring level truck loads and covered truck beds, limiting the height of the stockpiles to the height of the levee, wetting ramps three times a day, fencing the stockpile, installing asphalt ramps over the levee, lower-

ing the speed limit to 25 mph, installation of truck crossing signs, requiring sand hauling trucks to access the pits by traveling behind the levee.

**6.** This operations permit was the same kind held by Vulcan which RAC chose not to operate under.

that he did not have any immunity for his actions before the Levee Board; Alexander replied: "I'm going to get you." The Clulees did not attend this meeting.

After the June 2, 1997 meeting of the Parish Council and prior to the July 1, 1997 meeting of the Levee Board, there were two phone calls from the Clulee's home to Alexander's home—one for one minute and one for six minutes—for a total talk time of six minutes.

On July 3, 1997, Mary Clulee wrote a second letter on behalf of Homeplace to the Corps of Engineers asking that RAC amend the drawings of its proposed dredging area in accordance with its letter to her that it would not dredge the area next to her property.

At the July 7, 1997 meeting of the Parish Council, Alexander proposed a resolution to have a sales tax audit performed on Bayou Fleet. The resolution was rejected.

Two days before that Parish Council meeting there was a six minute phone call from the Clulee's home to Alexander's home.

Bayou Fleet filed the present lawsuit on July 14, 1997.

Despite the Parish Council's rejection of Alexander's proposed sales tax audit resolution, Alexander spoke to the head of the St. Charles Parish Tax Collection Department, R.J. Lorio, about Bayou Fleet's payment of sales taxes. On July 30, 1997, Lorio issued notice of a sales and use tax audit to Bayou Fleet. Bayou Fleet cooperated with the audit, which did not result in any citations for failure to pay taxes.

After the July 7, 1997 meeting of the Parish Council and before the July 30, 1997 tax audit notice, there were two one-minute phone calls from the Clulee's home to Alexander's home.

The Corps of Engineers issued a dredging permit to RAC on July 21, 1997, under four months from the date of application. This would have been the last permit RAC needed to begin operations at Bayou Fleet, but P & Z in discussions with the Parish President, who was historically opposed to sand pit operations, raised questions about and ultimately determined that RAC would have to apply for a "Change of Occupancy" permit for the Bayou Fleet site. No one challenged this permit, which was issued on September 22, 1997. No more permits were required in order for RAC to begin operations.

There is no evidence that the Clulee defendants or Alexander played any role in P & Z's decision to require this permit or in the length of time it took to obtain the permit. The evidence that on August 15, 1997, an unsigned, form affidavit was telefaxed between the Chaisson and Chaisson law firm and Alexander's home does not show that the Clulee defendants or Alexander were involved in the Change of Occupancy permit. The affidavit related to the issue of Bayou Fleet's non-conforming use and was to be used by residents in the immediate area of the sand pits who believed that Bayou Fleet's sand pits had ceased operations for a period of time. No one ever signed the affidavit, nor is there any evidence that Alexander or the Clulee defendants ever attempted to have any one sign the affidavit.[7]

Alexander introduced the Levee Law ordinance and the Special Legal Counsel resolution at the September 8, 1997 meeting of the Parish Council. The Levee Law would have made it a criminal offense for any person to cross over the levee without written permission of the Parish Council. The resolution acknowledged the opinion of the Parish Attorney that Bayou Fleet

7. The affidavit was the second page of the fax transmission. Alexander was not able to produce the first page of the fax in discovery. Typically, the first page of a telefax is a cover sheet with only the name of the sender, the sender's fax number, and the number of pages telefaxed. For this reason and because the affidavit was never used, the court rejects Bayou Fleet's argument that the absence of the first page should create an adverse inference against the Clulee defendants.

had maintained its non-conforming use, yet concluded without explanation that "it is in the best interest of the Parish Council and residents of St. Charles Parish to employ Special Legal Counsel to conduct a thorough investigation" of "whether or not Bayou Fleet has had a sand pit operation continuously for the past twelve months on property located on the Mississippi batture in Hahnville." The resolution empowered the Special Legal Counsel to "subpoena the business records of Bayou Fleet." Alexander requested that Joel Chaisson, counsel for Homeplace, be selected to serve as Special Legal Counsel.

Notice of these proposed acts was published in the local newspaper. The notice of the Special Legal Counsel resolution did not mention that it was directed at Bayou Fleet. Bayou Fleet did not have adequate notice of the proposed resolution. Neither Bayou Fleet, nor the Clulee defendants attended the September 8, 1997 Parish Council meeting.

The Parish Council voted to adopt both the ordinance and the resolution, but the decision as to whom to appoint as Special Legal Counsel was deferred pending receipt of a contract.

Parish President Chris Tregre vetoed both measures on September 11, 1997 because he believed the Parish Council had acted beyond its authority. On September 27, 1997, the Parish Council voted to override the vetoes, however, the acts never became law. After this court declared the acts unconstitutional, the Parish Council voted to rescind them.

After the July 30 tax audit letter and prior to the September 8, 1997 meeting of the Parish Council, there were 5 phone calls from the Clulees' home to Alexander's home—4 one-minute calls and one 18 minute call—for a total talk time of 18 minutes. Between September 8, 1997 and the September 22, 1997 override vote, there were three phone calls from the

Clulees' home to Alexander's home—each for one minute.

RAC wanted to place a small 6 by 6 foot guard house on the property, which required a permit. The pendency of this permit application did not prevent RAC from dredging and stockpiling sand. There is no evidence that anyone challenged the issuance of this permit; however, P & Z did request an opinion from the Parish Attorney as to whether the shack would present an expansion of the non-conforming use. There is no evidence that the Clulee defendants or Alexander played any role in this permit process. Once the Parish Attorney issued his opinion that it would have no effect on their non-conforming use, and the Fire Marshall approved the structure, P & Z issued RAC a permit on October 16, 1997 to install the guard shack.

RAC completed its project on time. The evidence establishes that it took RAC approximately 110 days to obtain the Corps of Engineers' permit, and approximately six months to obtain all permits necessary to commence operations. In comparison, when Homeplace applied for the same kind of dredging permit from the Corps of Engineers in January, 1998, it took over ten months to obtain the permit, notwithstanding that the Parish Council unanimously adopted a resolution to issue a letter of no objection.[8] Even considering the evidence that for two to three months the Clulees delayed the process by failing to take any action on their permit application, RAC's dredging permit application was approved in far less time.

Neal Clulee made a total of 46 telephone calls from his home to Alexander's home in 1997. The 1997 phone calls commenced on April 28, 1997, admittedly because of RAC's permit applications before the Corps of Engineers and the Levee Board, and continued until December 30, 1997. Twenty-eight of the 46 calls were one-minute calls with no conversation. Prior

8. Alexander abstained from voting.

to this lawsuit being filed, the records show seven phone conversations totaling 58 minutes between Clulee and Alexander.

Clulee did not recall specific phone conversations. He admitted discussing the RAC permits and his belief that Bayou Fleet had lost its non-conforming use. He explained that several calls were unrelated to Bayou Fleet and involved matters such as resident complaints about his business operations, a diversion project in St. Charles Parish, and the asphalt ramp the Parish required him to install. Clulee recalled speaking with Alexander on other occasions about the sand pit business in general. Alexander was trying to educate himself about the operations and the permitting process. Clulee thinks most of the phone calls were made as a result of the lawsuit being filed against him and Alexander. Indeed, there were only 15 phone calls totaling 58 minutes prior to the lawsuit being filed; whereas there were 31 phone calls totaling three hours and five minutes after the lawsuit was filed. Some of the calls Clulee made were to return calls initiated by Alexander to Clulee's beeper.

In addition to these permit and legislative processes, the court considers the parties' following history of litigation as relevant to the claims herein.

In the 1984, one of the Durant family companies sued Clulee personally to collect a debt and obtained a judgment in excess of $100,000. Durant's company filed a lien on Clulee's property and the sheriff foreclosed on Clulee's home. Durant's company purchased Clulee's home at the sale.

Also, in 1984, a dispute arose regarding the non-conforming use of the Clulees' sand pit. Both Chris Tregre, a Parish Council member at the time and now Parish President, and the Durant family, tried to stop the pit operations on the ground that the non-conforming use had been abandoned for five years. Tregre was acting pursuant to his constituents' opposition. Tregre attended hearings to voice his opposition and spoke to the parish

president about it. No legislative acts such as the resolutions and ordinance at issue here were proposed.

Another sand pit feud began in 1989 between the Clulees and the Giambellucas, who owned the pit in between Bayou Fleet and Homeplace. The court takes judicial notice of the facts of that dispute as set forth in *Giambelluca v. Parish of St. Charles*, 687 So.2d 423 (La.App. 5th Cir. 1996). Briefly, the dispute centered around the use of a levee ramp that was the only access to the Giambelluca property. After two lawsuits, one of which was presided over by Joel Chaisson (now Homeplace's attorney), who ruled in favor of the Clulees, a Parish ordinance sponsored at the request of Clulee by Alexander, and destruction of the ramp by Clulee, the Giambelluca property was left without road access and was forced out of business. The Giambelluca sand pit has been out of business ever since Clulee had the ramp torn up, leaving Homeplace and Bayou Fleet as the only sand pits operating in Hahnville.

Another sand pit lawsuit was brought by one of the Durant family companies, LA Materials, to have the Clulee sand pit closed based on loss of non-conforming use. LA Materials withdrew the suit when the operating company, Westside Sand, claimed that LA Materials was trying to monopolize the sand business.

■ Bayou Fleet urges the court to impose an adverse inference against the defendants because Mary Clulee, a will call witness for the defense, did not testify. The Fifth Circuit has described the adverse witness rule as an "archaism" for which there is no longer any justification, particularly where the witness could have been called by either party, as in the present case. *See Herbert v. Wal–Mart Stores, Inc.*, 911 F.2d 1044, 1048–49 (5th Cir.1990). In any event, the adverse witness rule is discretionary. *See Evangeline Refining Co. v. Charles N. Wooten, Ltd.*, 890 F.2d 1312, 1320 (5th Cir.1989). The court finds

that Mary Clulee's testimony would have offered no information that the court did not already have before it. Her testimony likely would have been cumulative to her husband's testimony. Moreover, the evidence from all the witnesses failed to show that she was personally involved in any of the alleged violations. *See id.* (quoting II J. Chadbourne, *Wigmore on Evidence* § 287). Mary Clulee was present during the entire trial, and Bayou Fleet could have called her as a witness. Finally, the court notes that Bayou Fleet did not raise this issue at trial. Under the circumstances of this case, the court declines to invoke the adverse witness rule.

## ANALYSIS

### A. Noerr–Pennington Doctrine

■ The Clulee defendants contend that they are immune from liability pursuant to the Noerr–Pennington doctrine.[9] *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The doctrine, which was developed by the Supreme Court in the context of antitrust law, has its underpinnings in First Amendment principles that the right to petition the government legislatively, judicially, or administratively is constitutionally protected speech regardless of its motivation. *Noerr*, 365 U.S. at 138, 81 S.Ct. at 530; *Pennington*, 381 U.S. at 669–70, 85 S.Ct. at 1593. "The essence of the

doctrine is that parties who petition the government for government action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Production v. Warner–Amex Cable Communications, Inc.*, 858 F.2d 1075, 1082 (5th Cir.1988), *cert. denied*, 491 U.S. 906, 109 S.Ct. 3189, 105 L.Ed.2d 697 (1989).

Although the Noerr–Pennington doctrine was originally applied in the antitrust context, it has been applied to protect First Amendment petitioning of the government from claims brought under federal and state laws, including section 1983. *Id.* at 1084. *See e.g., Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th Cir.1980) (section 1983) (landowners' secret meetings with city officials and petitioning for enactment of city ordinance to rezone plaintiff's property) (citing *Sawmill Products, Inc. v. Town of Cicero*, 477 F.Supp. 636, 642 (N.D.Ill.1979) (section 1983) (protesting presence of plaintiff's sawmill which was then shut down by town ordinance); *Weiss v. Willow Tree Civic Ass'n*, 467 F.Supp. 803, 816–18 (S.D.N.Y. 1979) (section 1983) (lobbying town officials and filing groundless judicial and administrative complaints to oppose zoning permit); *Aknin v. Phillips*, 404 F.Supp. 1150, 1153 (S.D.N.Y.1975), *aff'd*, 538 F.2d 307 (2d Cir.1976) (section 1983) (urging officials to enforce unconstitutionally vague noise ordinance against plaintiff's discot-

---

9. The court may consider the Noerr–Pennington doctrine with respect to the liability of the Clulee defendants even though they did not assert the doctrine in their answer. The court raised the issue *sua sponte* a few weeks prior to trial and ordered the parties to brief the issue. The Clulee defendants then included the issue in the pre-trial order, over Bayou Fleet's objection. It has been held that the Noerr–Pennington doctrine is not an affirmative defense in the sense that it is the plaintiff's burden to prove the substantive violation claimed, which cannot be done where the defendant's allegedly wrongful conduct consists of petitioning the government. *See PrimeTime 24 Joint Venture v. National Broad-*

*casting Co., Inc.*, 21 F.Supp.2d 350, 355 (S.D.N.Y.1998) (citing 1 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 207c (rev. ed.1997)); *see also McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558 n. 9 (11th Cir.1992) (citing Areeda and H. Hovenkamp). Certainly, there would be no justification for the court to reject application of the doctrine on a procedural error, where to do so would abridge the defendant's First Amendment rights. Here, where Bayou Fleet was given adequate advance notice of the court's intent to consider the issue, and where the doctrine was asserted in the pre-trial order, it is appropriate to consider the Noerr–Pennington doctrine as it may apply in this case.

heque); *Sierra Club v. Butz,* 349 F.Supp. 934, 938–39 (N.D.Cal.1972) (contractual interference) (filing lawsuit and administrative appeals to halt plaintiff's logging operation; filings constitutionally privileged even if motivated by malice)). Bayou Fleet's claims under section 1983 and the LUTPA are all based on the same events as the antitrust claims.

■ Bayou Fleet has accused the Clulee defendants of lobbying and influencing state and federal officials in private meetings, telephone calls, letters, and public hearings to deny permits, revoke Bayou Fleet's non-conforming use, and enact ordinances and resolutions, all designed to put Bayou Fleet out of business. Pursuit of that goal using the administrative and legislative channels and procedures that the Clulee defendants did was within their First Amendment rights. Their actions are nothing more than protected First Amendment activity to procure favorable government actions. They have the right to advance their opinions to government officials about Bayou Fleet's or RAC's business, whatever the underlying motive. Indeed, Bayou Fleet and other Durant family companies have pursued similar actions against the Clulees such as filing objections to permits and a lawsuit to declare a loss of non-conforming use. Bayou Fleet made lobbying efforts of its own. Bayou Fleet had private meetings with Alexander to get his support for the project; it garnered support from a United States Congressman. This is traditional political activity. The First Amendment protects "attempts to influence the passage or enforcement of laws," no matter

how harmful their incidental impact may be. *Noerr,* 365 U.S. at 135, 81 S.Ct. at 528.

The sham exception to the Noerr–Pennington doctrine does not apply in this case. That exception applies when a defendant uses "the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 380, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991). Here, the Clulee defendants genuinely sought to achieve the governmental measures for which they lobbied. The sham exception does not apply to them because their actions were designed to achieve the outcome of the processes they used.[10] Therefore, the petitioning of Alexander, the Parish Council, the CZAC, and the Corps of Engineers was not a sham. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 500 n. 4, 108 S.Ct. 1931, 1937 n. 4, 100 L.Ed.2d 497 (1988). Accordingly, the court finds that the Clulee defendants have no liability under the antitrust laws, section 1983, or the LUTPA because they are protected by the Noerr–Pennington doctrine.

As alternative reasons for absolving the Clulee defendants of any liability in this case, the court finds that the evidence fails to establish essential elements of the section 1983 and antitrust claims.

## B. Section 1983

■ In a section 1983 action the plaintiff must establish two essential elements: (1) that the conduct in question deprived a person of rights, privileges, or immunities

---

**10.** Bayou Fleet alleged but did not prove that the Clulee defendants abused the legislative process by bribing Alexander. There was some testimony that council members heard rumors that Clulee had bribed Alexander, but none of the witnesses were able to recall any specific details such as from whom they had heard the rumor. Because of the unreliability and prejudicial nature of this hearsay evidence, the court denied Bayou Fleet's motion to introduce this evidence under Federal Rule of Evidence 807. The court did allow the evidence as a proffer. Even if the court were to have admitted the evidence, the court finds that it would not carry any probative value because of its vagueness and unreliability. Furthermore, to the extent that Bayou Fleet contends that a corrupt or illegal conspiracy existed, the Noerr–Pennington doctrine does not recognize a conspiracy exception. *See City of Columbia v. Omni Outdoor Advertising Inc.,* 499 U.S. at 382–83, 111 S.Ct. at 1355–56.

secured by the Constitution or laws of the United States; and (2) that the conduct complained of was committed by a person acting under color of state law. *See* 42 U.S.C. § 1983; *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

■ The Clulee defendants are private persons who do not occupy positions that can be considered actors "under color of state law." A private person may be considered a state actor under color of state law if the individual is engaged in a conspiracy or willfully engages in joint activity with one or more parties acting under color of state law, even if the state agent is immune to liability. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Cinel v. Connick,* 15 F.3d 1338, 1343 (5th Cir.1994), *cert. denied,* 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994). In this case, the state official whose actions are implicated is Alexander. The parties stipulated that all of Alexander's actions were under color of state law.

■ A civil conspiracy under section 1983 is an agreement between private and public actors to violate the plaintiff's constitutional rights. *Cinel,* 15 F.3d at 1343. A conspiracy may be proven by circumstantial evidence, *Mack v. Newton,* 737 F.2d 1343 (5th Cir.1984); however, the acts of the alleged conspirators must show a "unity of purpose, common design, and understanding, or meeting of the minds in an unlawful arrangement." *Hale v. Townley,* 19 F.3d 1068, 1075 (5th Cir.1994) (citing *American Tobacco Co. v. U.S.,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

"The joint action inquiry focuses on whether the state has 'so far insinuated itself into a position of interdependence with [the private entity] that it must be recognized as a joint participant in the challenged activity ...'" *Gorenc v. Salt River Project Agr. Imp. and Power Dist.,* 869 F.2d 503, 507 (9th Cir.1989) (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961)). "A private party does not act under color of state law when [he] merely elicits but does not join in an exercise of official authority." *Auster Oil & Gas. Inc. v. Stream,* 764 F.2d 381, 388 (5th Cir.1985), *cert. denied,* 488 U.S. 848, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988). "It is not sufficient to allege that the [private and state] defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves towards an unconstitutional action by virtue of a mutual understanding. Even were such allegations to be made, they must further be supported by some factual allegations suggesting such a 'meeting of the minds'." *See Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1206 (7th Cir.1980).

■ Initially, it must be noted that there is scant evidence of personal involvement on the part of Mary Clulee, Homeplace, and N/C Materials. Under section 1983 there can be no liability, much less a conspiracy between individuals that had no personal involvement in the allegedly wrongful conduct. *See Murphy v. Kellar,* 950 F.2d 290, 292 (5th Cir.1992); *Jacquez v. Procunier,* 801 F.2d 789, 793 (5th Cir. 1986). Individual liability under section 1983 must rest on facts reflecting the defendant's personal participation or involvement in the alleged wrong. The only evidence regarding Mary Clulee is two letters she wrote on behalf of Homeplace to the Corps of Engineers objecting to the permit because of proposed dredging in front of her property. Her letters show that she was not trying to prevent issuance of a permit insofar as dredging in front of Bayou Fleet's property, but only dredging that might occur in front of her property. This evidence does not come close to establishing a conspiracy or joint action between her and Alexander. The only other evidence specifically regarding Homeplace is its appearance at the CZAC meeting through an attorney to voice its objection

to RAC's Corps of Engineers' permit. As for N/C Materials, the only evidence of action taken directly by it is the quote for sand it gave to RAC. This evidence is simply insufficient to establish a conspiracy between Homeplace and/or N/C Materials and Alexander. *See also Scutieri v. Estate of Revitz*, 683 F.Supp. 795, 800–01 (S.D.Fla.1988) (a private corporation is not vicariously liable under § 1983 unless a policy-making individual takes action constituting "official policy" of the corporation).

■  Both Alexander and Clulee specifically denied the existence of a conspiracy. Alexander indicated repeatedly at hearings and in his letters that his motives were to represent his constituents who had health and safety concerns about the sand pit operations. The evidence established that there are legitimate community concerns about sand pit operations.[11] Based on those concerns, the council members are historically opposed to sand pit operations. Clulee admitted that he was motivated by a belief that Bayou Fleet had lost its non-conforming use and by concern that there might be dredging in front of his property, both obviously matters of self-interest rather than community concerns. The fact that Alexander and Clulee wanted the same objective, that is, to prevent sand pit operations at Bayou Fleet, does not establish an agreement or joint action to put Bayou Fleet out of business by unconstitutional means.

Bayou Fleet places great emphasis on the telephone communications between Clulee and Alexander. As discussed above, private communications between a political representative and his constituent are legitimate. The First Amendment envisions interactions between political representatives and their constituents. There are no limits on how many times one can telephone a public official. Even so, in the court's opinion, the evidence does not show an unusual number or length of telephone conversations, considering that Alexander and Clulee were in legitimate cooperation with each other regarding RAC's permit applications, that Clulee had information about the technical permit process that would be helpful to Alexander, and that they had other legitimate matters to discuss, such as this lawsuit.

The evidence fails to establish that the Clulee defendants had any involvement in the Parish Attorney's investigation of the status of Bayou Fleet's non-conforming use, in the letter writing campaign that Alexander undertook to various political representatives and agencies, in the sales tax audit, the Levee Law ordinance, the Special Legal Counsel resolution, the requirement of a Change of Occupancy permit, the requirement of a permit to install the guard shack, or any delays associated with those two permits.

Having found insufficient evidence of a conspiracy or joint action to equate the Clulee defendants' conduct with state action, any conduct of Alexander that violated Bayou Fleet's constitutional rights is not actionable under § 1983 as to the Clulee defendants.[12] *See Scott v. Greenville County*, 716 F.2d 1409, 1424 (4th Cir.1983) (recognizing that "even overtly biased citizens who write letters, speak up at public

---

11.  In the prior opinion rendered by this court, the court noted that there was no evidence presented at the hearing on the permanent injunction that Bayou Fleet's or any other sand pit's operations caused problems in the community. *See Bayou Fleet*, 1997 WL 625492 *8. Such evidence was presented at the trial on the merits of plaintiff's claims.

12.  In the prior opinion rendered by this court, it was stated: "Robin Durant's uncontradicted testimony establishes that the resolution was part of a scheme to eliminate Bayou Fleet's business so that Home Place would be the only sand pit in town." *See id.* Neither the Clulees nor Alexander testified at that prior hearing. Furthermore, the court's conclusion herein, that there is no evidence of a conspiracy or joint action between the Clulee defendants and Alexander to put Bayou Fleet out of business by a unconstitutional means is not inconsistent with the court's prior statement.

meetings, or even express their prejudices in private meetings with public officials without formulating a joint plan of action are not 'conspiring' with those officials in a way that subjects them to § 1983 liability").

## C. Sherman Act, Sections 1 and 2

 Bayou Fleet's antitrust claims are based on sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. In order to state a claim for violation of § 1 of the Sherman Act, a plaintiff must allege (1) concerted action by two or more persons, (2) that unreasonably restrains interstate or foreign trade or commerce.

The evidence failed to show an unreasonable restraint of interstate trade. The permits RAC needed to begin its pit operations were issued without any delays beyond those normally encountered in the process. Even assuming that there were delays, there is no evidence that the delay impacted interstate trade.

A violation of section 2 of the Sherman Act is established when the plaintiff shows that the asserted violator: (1) has antitrust standing; (2) possesses or intends to possess monopoly power in the relevant market and (3) acquired or maintained that power or intends to do the same in a wilful manner. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 2859, 86 L.Ed.2d 467 (1985); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

The evidence failed to show that Bayou Fleet suffered an antitrust injury, which is a component of antitrust standing. *See Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1182 (5th Cir.1988). Bayou Fleet did not prove that the conduct of the Clulee defendants had any anticompetitive effect. RAC obtained all of the permits it sought. The evidence showed that the alleged delay in the permit process was not any longer than with other applications. And, even if there had been an unreasonable delay, there is no evidence that the delay

had an anticompetitive effect. Even assuming that the Clulee defendants played a wrongful role in passage of the Levee Law ordinance and the Special Legal Counsel resolution, (a fact which the evidence failed to prove), those acts were declared unconstitutional and rescinded before they took effect.

Accordingly,

IT IS ORDERED that judgment be entered in favor of defendants Neal Clulee, Mary Clulee, Homeplace Batture Leasing, Inc., and N/C Materials, Inc. and against plaintiff Bayou Fleet, Inc., dismissing plaintiff's claims with prejudice, plaintiff to bear costs.